# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2014-CA-00072-COA

**GENE SMILEY**                                                           **APPELLANT**

**v.**

**EUNIECA SMILEY**                                                   **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 12/16/2013 |
| TRIAL JUDGE: | HON. JACQUELINE ESTES MASK |
| COURT FROM WHICH APPEALED: | PONTOTOC COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANT: | DANIEL KEITH TUCKER |
| | ALLISON ANN WORLEY |
| ATTORNEY FOR APPELLEE: | BRIAN LEE STARLING |
| NATURE OF THE CASE: | CIVIL - DOMESTIC RELATIONS |
| TRIAL COURT DISPOSITION: | GRANTED DIVORCE AND DENIED APPELLANT CUSTODY OF AND VISITATION WITH THE MINOR CHILD |
| DISPOSITION: | AFFIRMED IN PART, REVERSED IN PART, AND REMANDED – 03/31/2015 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE IRVING, P.J., ROBERTS AND MAXWELL, JJ.**

**IRVING, P.J., FOR THE COURT:**

¶1. Gene Smiley appeals the custody decision rendered by the Pontotoc County Chancery Court, awarding custody of Alaina Bryant, Gene and Eunieca Smiley's former adopted daughter,[1] to Eunieca and denying him visitation rights. On appeal, Gene argues that the chancellor erred in finding that the doctrine of in loco parentis did not apply, and in finding that Gene did not rebut the presumption set forth in Mississippi Code Annotated section 93-

---

[1] Custody was awarded during divorce proceedings between Gene and Eunieca. However, prior to the custody determination, the adoption had been set aside.

5-24(9)(a)(i) (Rev. 2013).[2]

¶2. Finding error, we affirm in part, reverse in part, and remand for further proceedings.

FACTS

¶3. Gene and Eunieca were married on February 8, 1998. They had no natural children of their own. Over the course of their marriage, they became custodians of two minor children, Christopher Franks, born on September 23, 1998, and Alaina, born on June 30, 2004. Custody issues related to Christopher were adjudicated in the Juvenile Court of Memphis in Memphis, Tennessee, and are not at issue here. In an agreed order between the parties and Alaina's biological mother, Eunieca's cousin, the biological mother relinquished custody of Alaina to the parties when Alaina was approximately eight months old.

¶4. Gene and Eunieca separated in February 2009. However, the couple filed a joint petition for the adoption of Alaina in 2010.[3] After the couple separated, Christopher resided with Gene in Tennessee, and Alaina resided with Eunieca in Tishomingo, Mississippi.

---

[2] This section provides, among other things, that

where the custody of a child is in dispute, there shall be a rebuttable presumption that it is detrimental to the child and not in the best interest of the child to be placed in sole custody, joint legal custody or joint physical custody of a parent who has a history of perpetrating family violence. The court may find a history of perpetrating family violence if the court finds, by a preponderance of the evidence, one (1) incident of family violence that has resulted in serious bodily injury to, or a pattern of family violence against, the party making the allegation. . . . The court shall make written findings to document how and why the presumption was or was not triggered.

[3] Alaina's biological mother signed a waiver allowing Gene and Eunieca to formally adopt her.

2

Eunieca eventually filed a complaint for divorce in November 2010, requesting custody of Alaina, and Eunieca asked that Gene be given supervised visitation. The adoption was granted to Gene and Eunieca on November 5, 2010; however, on a motion filed by the guardian ad litem (GAL),[4] the adoption was set aside in January 2011. Eventually, Christopher was removed from Gene's custody because of a nonsexual physical-abuse incident against Christopher. After the removal, Christopher was placed with his biological mother.[5] On June 26, 2012, Eunieca amended her complaint to include allegations that Gene had abused Christopher. On August 1, 2013, the parties agreed to divorce on the ground of irreconcilable differences and to reserve the issues of child custody and visitation for determination by the chancery court.

¶5.     After the separation, and prior to the divorce, Gene kept in contact with Alaina in person and over the telephone until November 2011, when Eunieca unilaterally stopped allowing contact between the two. Gene did not file any pleadings requesting temporary custody modifications, but he participated in the hearings throughout the two-year process—from the time of the filing of the complaint for divorce to the granting of the divorce. The chancery court heard testimony over a two-day period. The GAL participated in the examination of all the witnesses.

[4] As discussed later in this opinion, after Eunieca filed her complaint for divorce, the chancery court appointed a different GAL to conduct an investigation and make recommendations to the court on the custody of Alaina.

[5] The record does not shed light as to the relationship, if any, between Gene and Christopher's biological mother or father.

¶6. At the hearing, Gene testified that he lived in Clinton, Mississippi, with his mother in a fifth-wheel trailer, was forty-one years old, and was currently unemployed. However, he explained that he was taking classes to become a chef, with aspirations to work in the governor's mansion. He stated that he had several degrees in the culinary arts. He also was trying to get a certificate in butchering and hoped to get a certificate in beverage management. Gene further testified that although there is only one room in the trailer, it would be for Alaina and that he could get a house if he needed to.

¶7. Gene stated that he received $1,600 a month in medical disability payments as a disabled veteran. He explained that he had pain in his back, knees, and fingers, but it did not interfere with his ability to take care of Alaina. He admitted to administering five belt licks to thirteen-year-old Christopher that left two stripes on Christopher's back. He also admitted that the spanking "crossed the line" on that one occasion. He denied hurting Christopher any other time. However, he admitted that he had spanked Christopher with a belt about twenty times over the years, but said the spankings never left bruises or welts. Gene testified that he had never been abusive toward Alaina.

¶8. According to Gene, the children started living with them when Gene was in the army and stationed in Fort Irwin, California. Gene explained that when Alaina was about three years old, they moved to Tishomingo, after he was medically discharged from the army. Gene further testified that he was present during Alaina's birth, and when Alaina was small, he was the primary caretaker because Eunieca worked. He explained that he did not work

4

or attend school for five years because of his disability. During this time, Eunieca worked at home, and Gene took care of the cooking and cleaning. When he was asked what care he provided for Alaina, he stated he was responsible for "waking her up, bathing her[,]. . . feeding her a little[,] . . . and just loving her."

¶9. Gene also testified that when he, Eunieca, Christopher, and Alaina were living together, they attended a church in Tishomingo. When he was asked about the allegations of inappropriate conduct asserted by various church members, Gene stated that the allegations were a conspiracy by the preacher's wife to retaliate against him. Gene believed the preacher's wife did not like him because he had told her that her granddaughter dressed inappropriately. Gene explained that the preacher had told him not to attend the church anymore, so he stopped going. Gene also stated that he believed Alaina would be in mental and emotional danger if left with Eunieca, and claimed that Eunieca was mean to the children.

¶10. Gene testified that after he and Eunieca separated, he continued to talk to Alaina and had weekend visitation with her. Gene testified that the last time he saw Alaina was when she was in the hospital for a tonsillectomy, and he came to the hospital to be with her. When Eunieca stopped allowing Alaina to speak with him, Gene asked his attorney how he could see his "little girl." Gene affirmatively responded when he was asked if he was told by his attorney to let the "court system handle it." However, Gene insisted that Eunieca delayed the process when she hired a different lawyer. He further testified that he had sent gifts to

Alaina, but for unknown reasons, the gifts were not accepted. Gene pointed out that despite the allegations of his misconduct, Eunieca had allowed him visitation while he was in Nashville, Tennessee, including overnight stays with Alaina from 2008 until 2010. He stated that Alaina was a "perfect baby," and that he would be able to care for her if he was granted custody or visitation.

¶11. Tia Hill, a twenty-three-year-old member of the church that the parties once attended, testified that there were several occasions when Gene had had, in her opinion, inappropriate physical contact with her. She described the first incident that occurred, when she was seventeen, at a church-sponsored youth "lock-in," where the youth members played games. According to Tia, Gene had helped out that night. One game involved the lights being turned off. Tia stated that when the lights were off, she felt someone with an adult-sized hand grab her buttocks, and, according to her, the only adult in the room was Gene. Tia stated one other girl, Margie Camp, told her that she felt someone grab her buttocks too. Tia did not report this incident because she could not be sure that it was Gene because the lights were off.

¶12. Tia testified about a second incident when she stopped to chat with church members who were hanging out with Gene as Gene worked on his motorcycle. She stated that a hair was lying across her chest, and Gene grabbed the hair, making her feel uncomfortable. She also testified that in a third incident, Gene had an inappropriate conversation with her and a friend, Paige Webb, about breast sizes. Finally, in a fourth incident, Tia explained that Gene wanted to have a cookout and a sleepover, and invited everyone to his house. Tia

explained that she was good friends with Eunieca because they were both in the church choir. She went to the Smiley's house to sleep over with several other youth-group church members, including Paige, Alaina, and Christopher. Tia testified that when she and Paige woke up early the next morning, Tia saw Gene at the edge of the bed that the two girls were sleeping in. Tia stated that Gene then asked for Paige's keys, so he could move Paige's car. Tia believed Gene's request for the keys to be a pretext, because the keys were visible on the table next to the bed. Tia asserted that Eunieca was a good mother and that Eunieca had a good relationship with Alaina.

¶13. Paige testified that she thought Gene acted inappropriately on a few occasions. She explained that when she was talking with a group of people at her church, including Gene, about working out and using the gym, Gene put his hand on her upper thigh and stated that he knew an exercise that would help her. Paige testified that she was eighteen years old at the time of the incident and that Gene's actions had made her feel uncomfortable. Paige also described the sleepover incident that Tia testified about. Paige testified that she had never witnessed Gene interact with Alaina in a disrespectful manner.

¶14. Bobby Wadkins, the former preacher at the church that the parties attended, testified that some of the leaders of the church had asked him to confront Gene about inappropriate conduct with minor girls. Based on confidential written statements by the girls and his own personal observations, Bobby felt that Gene's behavior was inappropriate at times. Bobby testified that he had not called the police because he felt that it was enough to confront Gene

about the situation. When he was asked if there was anything that would cause him to be concerned about Gene having custody of Alaina or visitation with her, Bobby responded, "No. I did not see – I never saw anything like that." When he was asked the same question about Eunieca, he stated that she is a "great mother, a working mother, supportive."

¶15. Darlene Wadkins, Bobby's wife, testified that on several occasions she would see Gene talking to and flirting with young girls. She saw him turn girls around and while standing behind the girls, put his hands under their breasts and lift them up. Gene claimed that he was trying to "pop their backs." Darlene stated that her granddaughter went to the Smileys' house on one occasion, and then all of a sudden, she did not want to go there anymore. The granddaughter never stated her reason for not wanting to visit the Smileys again. Darlene believed that Eunieca provided the primary childcare for Christopher and Alaina, and Gene did so on occasion. Darlene saw that Alaina loved Eunieca. Darlene testified that after her husband confronted Gene, Gene stopped coming to the church. Darlene stated that both Gene and Eunieca loved Alaina a lot. She noticed that Christopher had to "walk a chalk line" when it came to Gene, but she had never seen Gene hit Christopher. However, she opined that Alaina needed to be with Eunieca.

¶16. Tina Webb, Paige's mother, testified that she believed that, considering Alaina's age, the way Alaina sat in Gene's lap was inappropriate. According to Tina, Alaina would face Gene and have both her legs straddling him. Tina agreed that Gene and Eunieca acted like parents to Alaina and that Alaina loved them both.

8

¶17.    Eunieca testified that she was working at the Harrisburg Baptist Church Day School and made $1,600 a month, and that she used to work as a medical transcriptionist. She takes blood-pressure and anxiety medication. Eunieca testified that Alaina is nine years old and in the fourth grade. Eunieca recalled that Gene would get very upset with Alaina when she would not talk to him on the phone. She further testified that Gene had last seen Alaina when she had her tonsils removed during the spring of 2010. She did not think Alaina would recognize Gene. Eunieca stated that she lives with her mother in a five-bedroom house in Pontotoc, Mississippi, and that Alaina has her own room. She explained that she did not want Alaina to live with Gene in a trailer, nor did she want Gene to visit her.

¶18.    Eunieca explained that the reason the adoption of Alaina and Christopher moved forward, despite the fact that she and Gene had separated, was because she felt she had no choice. She stated that she went along with what Gene said because she was in an abusive relationship and believed she had "battered woman syndrome." According to Eunieca, Gene's plan was for Eunieca to raise Alaina until she was ten years old, and then "he would take over."

¶19.    Eunieca stated that Gene often put his hands around her throat. Eunieca testified that the children witnessed Gene putting his hands around her throat, and Alaina saw Gene hit Christopher on several occasions. Eunieca explained that the children had a plan to get help if Gene did something to Eunieca. She also stated that Gene would tell her that she was the reason Christopher "got hurt," because she did not stop Gene when he "would see red."

9

Eunieca testified that she thought Christopher was better off with his biological mother instead of Gene.

¶20. Eunieca also testified that she never saw or was told of physical or sexual abuse by Gene with respect to Alaina and confirmed that Gene loved Alaina. However, Eunieca stated that Alaina went to counseling during the summer before her third-grade school year for about six months because she was very nervous and not sleeping well. According to Eunieca, the counseling sessions with Meghan Anderson reinforced her decision to cease all communication between Alaina and Gene. Eunieca stated that she loved her child and would "die for her." She was sure Alaina loved her too.

¶21. Finally, Ben Franklin Carlyle testified that he had known Gene since 2009, when they were in culinary school in Nashville. Ben testified that during the two-year culinary program, Gene was outgoing, and everybody liked him. Ben stated that he had never witnessed any disciplinary issues between Gene and Christopher or Alaina. Ben testified that he had hung out with Christopher and Gene often and characterized their relationship, at the time, as good. He recalled meeting Alaina twice. He did not observe any problems with Alaina's visits. Ben also stated that Gene always expressed a desire to see Alaina.

¶22. In her report, the GAL recommended that Eunieca be granted primary legal and physical custody of Alaina, with no type of custody to Gene. Also, in her report, the GAL reserved making a recommendation regarding visitation to Gene "until the conclusion of all testimony." The GAL found, by a preponderance of the evidence, the existence of a pattern

of family violence perpetuated by Gene against Eunieca and Christopher, and that Alaina witnessed those acts. The GAL's finding was confirmed by Meghan, Alaina's counselor. Meghan also indicated that when she asked Alaina about Gene, Alaina would shut down and "would often jump into imaginative play." According to the GAL's report, the counselor explained that Alaina's conduct was indicative of "someone disassociating herself with something that was traumatic."

¶23.    In addition to evaluating the *Albright*[6] factors, the GAL considered whether Gene presented evidence sufficient to overcome the rebuttable presumption that a child should not be placed in the custody of a parent who has a history of perpetrating violence. She found that there was no evidence rebutting the presumption, and it would be detrimental to Alaina and not in her best interest to be placed in the sole custody, joint legal custody, or joint physical custody of Gene.

¶24.    After hearing the testimony, considering the GAL's recommendation, and applying applicable statutory and case law, the chancery court issued its order denying Gene custody and visitation with Alaina. The chancery court specifically found that Gene did not have standing to seek custody of Alaina based on in loco parentis. But in the alternative, even if Gene had standing based on in loco parentis, the domestic-violence presumption established by section 93-5-24(9)(a)(i) barred Gene from any type of custody. The chancellor further found that visitation was not in the best interest of the child. Gene now appeals.

---

[6] *See Albright v. Albright*, 437 So. 2d 1003, 1005 (Miss. 1983).

11

¶25. On appeal, Gene argues that the chancery court erred in finding that he did not have standing to seek custody of Alaina because the doctrine of in loco parentis did not apply. Gene further argues that, since he has standing, the chancery court erred in finding that one incident of abuse, namely, the spanking of Christopher, triggered the applicability of the presumption set forth in section 93-5-24(9)(a)(i). Finally, Gene argues that the chancery court erred in not doing an on-the-record *Albright* analysis when it awarded custody to Eunieca.

¶26. "Chancellors are vested with broad discretion, and this Court will not disturb the chancellor's findings unless the court's actions were manifestly wrong, the court abused its discretion, or the court applied an erroneous legal standard." *Andrews v. Williams*, 723 So. 2d 1175, 1177 (¶7) (Miss. Ct. App. 1998) (citation omitted). The Mississippi Supreme Court recognizes the doctrine of in loco parentis, and has "defined a person [acting] in loco parentis as one who has assumed the status and obligations of a parent without a formal adoption." *Worley v. Jackson*, 595 So. 2d 853, 855 (Miss. 1992) (citations omitted).

¶27. In *J.P.M. v. T.D.M.*, 932 So. 2d 760, 765-70 (¶¶14-26) (Miss. 2006), the Mississippi Supreme Court upheld a chancellor's ruling that a man who had been raising a child as his own should be given custody of the child despite the fact that another man was proven to be the biological father. The supreme court discussed with approval the doctrine of in loco parentis. *Id.* at 768-70 (¶¶20-26).

¶28. Here, we find the chancery court committed manifest error when it held that Gene lacked standing. The record reflects that Gene supported, cared for, and loved Alaina as her father. While both Eunieca and Gene were involved in Alaina's upbringing, Gene testified that he was there in the delivery room when Alaina was born and performed day-to-day parental duties since he was not working. The record reflects that at the hearing, Gene presented, through photographs and videos, a strong bond between himself and Alaina. Eunieca did not testify to the contrary, and all others who testified viewed Gene as the father of Alaina. Although there was significant testimony about the alleged character and habits of Gene, it did not affect Gene's relationship status with Alaina. We find that Gene was the father of Alaina vis–à–vis the doctrine of in loco parentis. Even the chancery court stated that "[i]t appears [Gene] formerly held a close relationship with [Alaina], but the proof was clear that he no longer discharges all duties incident to the parental relationship." In other words, the chancery court found Gene did indeed have a close relationship with Alaina. However, the chancery court felt that the change of the parental relationship occurred when Eunieca made the decision to halt any relationship between Alaina and Gene.

¶29. In light of this finding, we must determine whether Gene retained the parental status after Eunieca stopped allowing Gene to communicate with Alaina. Helpful in our determination is evaluating the treatment of a stepparent once a marital relationship has ended, when there has been no formal adoption. In that situation, "authorities agree that absent an intention that it continue, an in loco parentis relationship usually terminates upon

13

divorce. Similarly, there is authority that such a relationship terminates upon a separation of the husband and wife unless the party standing in loco parentis to the child means that it should continue." *Jackson v. Jackson*, 278 A.2d 114, 115 (D.C. Ct. App. 1971) (internal citations omitted); *see also Logan v. Logan*, 730 So. 2d 1124, 1126 (¶9) (Miss. 1998) (holding that a stepparent should be allowed to have custody of the stepchild based on the affection for and support of that child over a period of time). We, therefore, look to the record for evidence to determine whether Gene intended to stay in Alaina's life as her father.

¶30.    Gene explained that although he stopped communicating with Alaina, at Eunieca's behest, he continued to fight for custody using the "court system." Furthermore, Gene tried to send gifts on Valentine's Day and on Alaina's birthday; both were rejected. The most obvious evidence of his intention to be Alaina's father was his attempt to adopt her. In fact, the adoption was approved, but was later set aside. There is nothing in the record that suggests that Gene abandoned his intention to be a parent to Alaina. Therefore, we reverse the chancery court's judgment in its findings that Gene lacked standing at the time of the custody hearing.

¶31.    The chancery court made further findings that in the event that Gene had standing, he was precluded from any type of custody because the presumption set forth in section 93-5-24(9)(a) had been triggered, and Gene had not rebutted it. Since we find that Gene stood in loco parentis to Alaina and, therefore, had standing, we look to see if the evidence supports the chancery court's finding that the presumption was triggered and that Gene failed

14

to rebut it.

¶32. Section 93-5-24(9)(a)(iii) states that the presumption—that it is detrimental to the child and not in the best interest of the child to be placed in sole custody, joint legal custody, or joint physical custody of a parent who has a history of perpetrating family violence—"may only be rebutted by a preponderance of the evidence," and that:

> In determining whether the presumption set forth in subsection (9) has been overcome, the court shall consider all of the following factors:
>
>> 1. Whether the perpetrator of family violence has demonstrated that giving sole or joint physical or legal custody of a child to the perpetrator is in the best interest of the child because of the other parent's absence, mental illness, substance abuse or such other circumstances which affect the best interest of the child or children;
>>
>> 2. Whether the perpetrator has successfully completed a batterer's treatment program;
>>
>> 3. Whether the perpetrator has successfully completed a program of alcohol or drug abuse counseling if the court determines that counseling is appropriate;
>>
>> 4. Whether the perpetrator has successfully completed a parenting class if the court determines the class to be appropriate;
>>
>> 5. If the perpetrator is on probation or parole, whether he or she is restrained by a protective order granted after a hearing, and whether he or she has complied with its terms and conditions; and
>>
>> 6. Whether the perpetrator of domestic violence has committed any further acts of domestic violence.

¶33. Section 93-5-24(9)(a)(iv) requires the court to "make written findings to document

15

how and why the presumption was or was not rebutted." Here, the chancery court found that Gene's "pattern of abusive treatment of Christopher triggered the . . . presumption . . . . The presumption was not rebutted by . . . credible proof." While the court honed in on the excessive spanking as "credible proof," it ultimately found that there was a pattern of abuse. While the chancery court did not "make written findings to document how and why the presumption was or was not rebutted," as required by the statute, the chancery court also found, and we agree, that Gene did not offer any proof of counseling or participation in a parenting program, or proof that he had complied with any of the factors listed in section 93-5-24(9)(a)(iii) that would entitle him to a finding that he had rebutted the presumption. The GAL's report supports the chancery court's findings.

¶34. As stated, Gene also asserts that the chancery court failed to consider the *Albright* factors when it awarded custody of Alaina to Eunieca and denied him custody and visitation. The chancery court specifically stated:

> [T]he child has been continuously in the actual custody of Eunieca, who has continuously fulfilled all parental duties toward the child and who stands in loco parentis to her. Alaina has thrived while with Eunieca. With no other person coming forth with standing to request custody, the natural mother of the child joining in the request for relief, and the GAL for the child recommending the same, the [c]ourt finds the best interest of the child shall be served by her physical and legal custody being awarded to Eunieca.

In essence, the chancery court adopted the GAL's recommendation. The GAL's report included an *Albright* analysis and recommended that Eunieca be given full custody of Alaina. As such, despite our finding that Gene had standing, we find that the chancery court's

16

custody award is supported by the evidence.

¶35. Finally, the chancery court found that there were "insufficient safeguards" in place to ensure Alaina's safety if she was with Gene, and, as such, any form of visitation was not in the child's best interest. Mississippi Code Annotated section 93-5-24(9)(d)(i) (Rev. 2013) states that "[a] court may award visitation by a parent who committed domestic or family violence only if the court finds that adequate provision for the safety of the child and the parent who is a victim of domestic or family violence can be made."

¶36. The record indicates that the chancery court did not consider whether adequate provisions could be made that would allow Gene to have visitation with Alaina. Rather, the chancery court, in a cursory fashion, determined that there were "insufficient safeguards" in place to ensure Alaina's safety if Gene was allowed visitation with her. Section 93-5-24(9)(d)(ii) outlines several restrictions that the chancery court may place on a party who has committed an act or acts of domestic or family violence and is seeking visitation. The record before us reveals that the chancery court did not consider whether any of the restrictions would be adequate for the safety of Alaina and Eunieca if visitation was allowed. As stated, the GAL reserved making a recommendation regarding visitation until the conclusion of all testimony. However, the record does not show that the GAL ever made a recommendation that the chancery court could have relied on. As such, we find that the chancery court committed an abuse of discretion in its denial of visitation. Therefore, we reverse the chancery court's denial of visitation to Gene. However, to be clear, we are not

17

finding that visitation is warranted, only that, on remand, the chancery court must determine whether safeguards can be put in place that would allow for an award of visitation and, at the same time, ensure Alaina's and Eunieca's safety.

¶37. **THE JUDGMENT OF THE PONTOTOC COUNTY CHANCERY COURT IS AFFIRMED IN PART, REVERSED IN PART, AND REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. ALL COSTS OF THIS APPEAL ARE ASSESSED ONE-HALF TO THE APPELLANT AND ONE-HALF TO THE APPELLEE.**

**LEE, C.J., GRIFFIS, P.J., BARNES, ISHEE, ROBERTS, MAXWELL AND FAIR, JJ., CONCUR. CARLTON, J., DISSENTS WITH SEPARATE WRITTEN OPINION. JAMES, J., NOT PARTICIPATING.**

**CARLTON, J., DISSENTING:**

¶38. I would affirm the decision and judgment of the chancellor; therefore, I respectfully dissent from the majority's opinion. The record reflects no abuse of discretion in the chancellor's determination that Gene failed to rebut the presumption established in Mississippi Code Annotated section 93-5-24(9)(a)(i) (Rev. 2013).