# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2023-CA-01271-COA

LISA EDWARDS                                                       APPELLANT

v.

ERIN JOHNSON AND JAMES DWYER                                       APPELLEES

DATE OF JUDGMENT:             09/06/2023
TRIAL JUDGE:                  HON. D. NEIL HARRIS SR.
COURT FROM WHICH APPEALED:    JACKSON COUNTY CHANCERY COURT
ATTORNEY FOR APPELLANT:       DIANNE HERMAN ELLIS
ATTORNEYS FOR APPELLEES:      STEPHEN WALKER BURROW
                              MYRA ABIGAIL CUNNINGHAM
NATURE OF THE CASE:           CIVIL - DOMESTIC RELATIONS
DISPOSITION:                  REVERSED AND REMANDED - 10/07/2025
MOTION FOR REHEARING FILED:

**BEFORE CARLTON, P.J., McDONALD AND LASSITTER ST. PÉ, JJ.**

**CARLTON, P.J., FOR THE COURT:**

¶1.     Lisa Edwards and Erin Johnson became romantically involved in late 2015. At that time, Erin was pregnant as a result of a sexual relationship with James Dwyer. When Erin learned she was pregnant, she and James were no longer involved with each other. Erin did not tell James about her pregnancy.

¶2.     Lisa and Erin were living together as a couple when Erin gave birth to L.J.[1] in February 2016. The couple and L.J. lived together as a family until Lisa and Erin's romantic relationship ended in March or April 2018.

¶3.     Lisa subsequently filed a petition to establish visitation with L.J. in the Jackson

---

[1] We use initials to protect the minor child's anonymity.

County Chancery Court, alleging that "[she] has, at all times since his birth, acted in loco parentis to [L.J.]" After protracted litigation and a one-day trial, the chancellor dismissed Lisa's petition. Lisa filed a motion for reconsideration based on the Mississippi Supreme Court's decision in *Brownlee v. Powell*, 368 So. 3d 1268 (Miss. 2023), but the chancellor denied the motion.

¶4.     Lisa appeals, asserting that the chancellor committed reversible error (1) "by holding that Mississippi law requires [Lisa] to prove parental unfitness to seek or obtain in loco parentis visitation"; (2) "by holding that *Troxel v. Granville*, 530 U.S. 57 (2000), requires [Lisa] to prove parental unfitness to seek or obtain in loco parentis visitation"; and (3) "by applying the unclean hands doctrine to bar [Lisa's] petition for visitation without regard to the best interests of the child." For the reasons set forth below, we reverse the chancery court's final judgment and remand for the chancery court to determine Lisa's in loco parentis status to L.J. and conduct further proceedings, if necessary, consistent with this opinion.

### STATEMENT OF FACTS AND PROCEDURAL HISTORY

¶5.     As noted, Lisa and Erin became romantically involved in late 2015 while Erin was pregnant with L.J. from a previous sexual encounter with James. Erin did not tell James about L.J., but she did tell Lisa that James was L.J.'s father. Erin told her family and others, however, that L.J. was conceived by artificial insemination. At that time, Lisa did not betray Erin's confidence by telling anyone otherwise.

¶6.     Lisa and Erin were living together in Florida when L.J. was born in February 2016. Lisa was present for L.J.'s birth and cut the umbilical cord. Following L.J.'s birth, Erin

2

stayed home to care for L.J., and Lisa provided financial support for the family. When L.J. became very sick with a respiratory disease in September 2016, both Lisa and Erin took turns staying with L.J. during his ten-day hospital stay.

¶7. Erin returned to work in October 2016. Lisa and Erin researched daycare options, and Lisa paid for L.J.'s daycare. Both Lisa and Erin took care of L.J. and had active roles in his upbringing. In March 2017, the family moved from Florida to Ohio to live near Lisa's mother, who then also helped care for L.J. Lisa and Erin purchased a home together in Ohio. The couple did not marry, and no adoption or guardianship proceedings concerning L.J. were initiated.

¶8. In March or April 2018, Lisa and Erin separated. Erin moved back to Mississippi with L.J. Erin contacted James in April or May 2018 and told him about the birth of his son. Lisa subsequently contacted James about L.J.

¶9. Although Erin initially allowed Lisa to have some contact with L.J. following the couple's separation, by September 2018, the situation became unworkable. Thus, in December 2018, Lisa filed a petition to establish visitation with L.J. Erin moved to dismiss the petition, asserting, among other arguments, "[t]hat the [p]etition fails to state a claim upon which relief can be granted, as Lisa cannot obtain visitation with the minor child absent a determination that Erin is unfit."

¶10. On June 19, 2019, the chancellor awarded Lisa temporary visitation with L.J., specifically finding that Lisa stood in loco parentis to L.J. and that it was in L.J.'s best interest to have temporary visitation with Lisa. The chancellor noted at the hearing that the

3

visitation order "is a temporary order, subject to the parties' getting a date for a trial on the merits." The temporary visitation order allowed Lisa visitation every other weekend from Friday at 5:00 p.m. through Sunday at 5:00 p.m. when she was residing less than 150 miles from Erin; if Lisa resided over 150 miles from Erin, then visitation was allowed every third weekend from Friday evening through Sunday evening. Lisa was also awarded holiday visitation, as well as "Facetime" visitation every Monday and Wednesday. The temporary visitation order also provided that Lisa was to pay child support of $200 per month. The chancellor also denied Erin's motion to dismiss on the same day.

¶11. On December 11, 2019, James appeared in the action and filed a motion to dismiss Lisa's complaint, an answer to the complaint, and a cross-claim seeking a paternity determination, custody, and visitation. James also joined in various pleadings Erin had previously filed.[2]

¶12. Over two years later, on March 1, 2022, the original chancellor recused herself because one of the lawyers of record in this case was that chancellor's political opponent. The case was transferred to Chancellor D. Neil Harris Sr. On March 22, 2022, the chancellor suspended Lisa's visitation rights pending the recommendation of a guardian ad litem (GAL).[3] The GAL filed a report on April 26, 2022. In that report, the GAL first provided

_____

[2] Several other pleadings, filings, and orders were entered between January 2020 and February 2022. We need not detail these items for purposes of this opinion.

[3] Before this case was assigned to Chancellor Harris, the original chancellor had appointed a GAL who filed a report on December 6, 2020. Subject to any new evidence arising, that GAL found that L.J. "has created a bond with Lisa following the Order of this Court to mandate visitation." The GAL further found, however, that "[t]he child is greatly impacted by the stress between Lisa and Erin[,] . . . [and] the stress related to [L.J.'s]

4

an "overview of the [Mississippi] caselaw regarding non-biological parent rights" with respect to custody or visitation rights. The GAL then opined that Lisa had standing to seek visitation, as distinguished from custody, as follows:

> From the review of the above cases, the GAL is of the opinion that the court has jurisdiction to award [Lisa] visitation with the minor child if it determines that she 1) stood in loco parentis to the child; and 2) she continued to pursue a relationship with the child after the cessation of her relationship with [Erin]. As to the former, the GAL agrees with the earlier finding of the court . . . that [Lisa] stood in loco parentis to the child during the approximate year and half that she, [Erin], and the child resided together and/or she helped to support the child. . . . [Regarding the second factor,] it is uncontested that following the parties' break-up, [Lisa] has relentlessly pursued a relationship with the minor child. As such, the GAL believes that [Lisa] has standing to pursue visitation with the minor child. She, of course, has no right to custody of the minor child as there is no credible allegation that either parent is unfit.

¶13. The GAL did not offer an opinion concerning the child's best interest, but he did observe that "[t]he counseling records reflect a true bond [between Lisa and L.J.]," as did his interview with Lisa; his inspection of Lisa's home, which he found was "covered in pictures of the young man [(L.J.)]"; his interview with the child (who was then six years old); and, to a lesser extent, even his interview with Erin, "who does not deny that the child has a bond with [Lisa]." The GAL concluded that "[r]eal love exists between [Lisa and L.J.]. They are bonded." On the other hand, the GAL expressed concern that "[Lisa] continues to overstep her bounds in regard to the child, insisting that she and [Erin] are on equal footing in regard to their role with the child."

---

visitation with the former romantic partner of his natural mother negatively impacts his relationship with his natural mother and natural father." The GAL recommended that "[i]f the Court continues visitation with Lisa it will be crucial that both Lisa and Erin attend counseling sessions together for the benefit of [L.J.]."

5

¶14.    The GAL ultimately recommended visitation, as follows:

> [Erin] allowed [Lisa] to support the child and to form a relationship with the child and, as such, the court should not sever that relationship without strongly considering the potentially dilatory impact on the child of discontinuing the relationship. On that same front, the GAL believes that the issues with [Lisa's] potential inability to separate her role as, ultimately, an aunt-like figure from her desire to be a true parent to the child should also be strongly considered in determining what, if any, visitation to award.  With that being said, at this time, and reserving the right to alter the recommendation as more evidence or testimony is presented, the GAL recommends that [Lisa] receive one weekend a month with the minor child, a week during the summer time, and a few days around Christmas to spend with the child.

¶15.    The GAL also noted, however, that "[Lisa] needs to accept her role, enjoy her time with the child, and allow [Erin] and [James] to be the parents.  If she is unable to do so, the court would be justified in finding it is not in the child's best interest to continue visiting with [Lisa]."

¶16.    The GAL issued a supplemental report on January 12, 2023, two weeks before trial. He  specifically noted that "a determination as to whether [Lisa] stood in loco parentis to the minor child needs to be made."  In the GAL's view, "[a]s stated previously, the GAL believes the facts support finding that [Lisa] stood in loco parentis to the minor child during the parties' relationship."  The GAL noted, however, that "minds could differ on this front, particularly in regard to the length of time that [Lisa] acted as a parent to the child."

¶17.    In concluding, the GAL again recommended visitation, as follows:

> Subject to the testimony and evidence presented at trial, . . . the GAL's current recommendation is to allow limited visitation between [Lisa] and the minor child. The visitation should be limited enough that there will be no confusion in parental roles but substantial enough to allow the bond between [Lisa] and the child to continue.

6

¶18.    A one-day trial was held on January 13, 2023.  Erin and Lisa both testified, largely addressing the facts set forth above.[4]  The GAL also testified, opining that L.J. had bonded with Lisa during the time when Lisa and Erin were together; the bond continued through Lisa's continued visitation with L.J. until March 2022; and because Lisa continued to pursue visitation through this case, that preserved her in loco parentis status.

¶19.    The chancery court issued its "Findings of Fact[,] Conclusions of Law[,] and Final Judgment" (final judgment) on September 6, 2023, dismissing Lisa's petition for visitation. In making this determination, the chancellor concluded:

> [T]he law requires the Court to deny the application of in loco parentis to Lisa regarding L.J.  Lisa does not qualify for in loco parentis status and thus is not entitled to visitation because there are two fit biological parents.  The law does not allow the court to permit third-party visitation with a child when the biological parents object.

¶20. Although the chancellor recognized that "if the natural[]parent presumption is successfully rebutted," then "the court may determine[] whether an award of custody to the challenging party will serve in the child's best interest," but the chancellor never reached this determination because "Lisa did not prove unfitness of the natural parents James and Erin." We discuss the chancellor's final judgment in further detail below.

¶21.    Lisa filed a motion seeking reconsideration or a new trial based on the Mississippi Supreme Court's decision in *Brownlee v. Powell*, 368 So. 3d 1268 (Miss. 2023), which Lisa asserted "made clear [that] a showing of parental unfitness is not a requirement for the in

---

[4] Two of Lisa's friends who had observed Lisa with L.J. also briefly testified about the loving relationship between Lisa and L.J.  Additionally, Lisa's mother testified about her role in L.J.'s life and her observations of the loving relationship between Lisa and L.J.

loco parentis doctrine to apply." The chancery court denied Lisa's motion, interpreting the *Brownlee* decision as "simply stat[ing]" that both "the natural parent presumption must be overcome," and "the parent must be found unfit to make a finding of in loco parentis." In the chancellor's interpretation, "the court would have to make findings on both unfitness and overcoming the natural parent presumption to find in loco parentis before finding visitation for any third party." Reiterating that "[t]here was no proof that either of the natural parents were unfit," the chancery court found these factors were not met in this case.

¶22. Lisa filed her notice of appeal on November 27, 2023.

**STANDARD OF REVIEW**

¶23. "[A] chancellor's findings of fact will not be disturbed unless manifestly wrong or clearly erroneous." *Ellis v. Ellis*, 334 So. 3d 1148, 1152 (¶14) (Miss. 2022). However, "[w]hen reviewing questions of law, this Court employs a de novo standard of review." *Olson v. Bennett*, 271 So. 3d 781, 785 (¶12) (Miss. Ct. App. 2018) (quoting *Rice v. Merkich*, 34 So. 3d 555, 557 (¶7) (Miss. 2010)). A "reviewing court 'will not hesitate to reverse if it finds the chancellor's decision is manifestly wrong, or that the court applied an erroneous legal standard.'" *Chism v. Chism*, 285 So. 3d 656, 661 (¶12) (Miss. Ct. App. 2019) (quoting *Owen v. Owen*, 928 So. 2d 156, 160 (¶11) (Miss. 2006)).

**I.     *Brownlee* and In Loco Parentis Visitation**

¶24. Lisa asserts that "[t]he chancery court erred by requiring [her] to prove parental unfitness to seek in loco parentis visitation," a ruling that Lisa asserts "directly contradicts" the supreme court's recent decision in *Brownlee*. Upon review, we find that the chancellor

8

erred on a more fundamental level—namely, by failing to properly address the threshold issue in this case, which is whether Lisa, in fact, stood in loco parentis to L.J. Accordingly, we reverse the chancellor's judgment and remand this case for proceedings consistent with this opinion.[5]

### A. *Brownlee v. Powell*, 368 So. 3d 1268 (Miss. 2023)

¶25. Given that this issue centers on *Brownlee*, an in-depth discussion of this case is warranted. In *Brownlee*, the Mississippi Supreme Court found that a person proving in loco parentis status may be awarded visitation upon a showing "that special circumstances exist, i.e., in very limited, unique situations, in which justice so requires and the child's well-being demands a relationship with a person who has stood in loco parentis in his or her life." *Brownlee*, 368 So. 3d at 1274 (¶22) (citation and internal quotation marks omitted).

¶26. Pamela Brownlee and Jessica Powell met in 2014. *Id.* at 1270 (¶2). At the time, Jessica had a seven-year-old son (A.M.P.) who had no relationship with his legal father. *Id.* Jessica's daughter (E.R.L.), was born just before Pam and Jessica met. *Id.* at (¶3). Jessica had "primary custody" of E.R.L., *id.* at 1270 n.1, and E.R.L.'s legal father was "an active parent in her life and assumed all responsibilities of parenthood." *Id.* at (¶2). Pam and Jessica did not marry but lived together with the children until they broke up in 2019. *Id.* at (¶3).

---

[5] The dissent asserts that "[t]he majority first concludes that the chancellor erred by finding that Lisa did not stand *in loco parentis* with the child." Dis. Op. at ¶58. But our determination on this issue is based upon a more fundamental issue. That is, as discussed in detail above, we find that the chancellor erred by failing to properly address the in loco parentis issue at all.

¶27.    After the relationship ended, Pam sought in loco parentis visitation of both children. *Id.* at 1270-71 (¶¶3-4). Pam initially claimed that E.R.L.'s parents were unfit but later dropped that claim. *Id.* at 1271 n.3. Jessica[6] moved to dismiss Pam's claim for failure to state a claim upon which relief could be granted, pursuant to Mississippi Rule of Civil Procedure 12(b)(6). *Id.* at (¶6). The chancellor granted Jessica's motion, finding Pam lacked standing to seek visitation because there was no allegation that the children's legal parents were unfit, *id.* at 1272 (¶¶14, 16), and that Pam failed to state a claim for relief under Rule 12(b)(6). *Id.* at (¶16).

¶28.    The supreme court disagreed with the chancellor's ruling, holding that Pam had standing to pursue her claim and that dismissal pursuant to Rule 12(b)(6) "was incorrect because Pam's complaint states a claim for relief. We cannot say that she cannot present any set of facts that could lead to her success." *Id.* Accordingly, the supreme court reversed and remanded the case, stating, "On remand, if Pam can prove that she falls within this Court's carved out exception of the 'very limited, unique situations' below, her claim succeeds." *Id.*

¶29.    In reaching this conclusion, the supreme court squarely rejected Jessica's contention that there are only two categories in which the courts "have permitted third party visitation absent a finding that the natural parents are unfit[;] . . . [namely,] the cases of spouses who believed a child was theirs biologically and were married to the mothers and thus enjoyed in loco parentis standing and grandparents, whose rights are addressed by statute." *Id.* at (¶12). The supreme court explained, "We have never said [the doctrine of in loco parentis] is

_____

[6] The chancellor consolidated the biological fathers' interests with Jessica's. *Id.* at 1270 n.2.

applicable only in these two situations, but we have said it is only applicable in 'very limited, unique situations.'" *Id.* at (¶13) (quoting *Wells v. Smith* (*In re Smith*), 97 So. 3d 43, 47 (¶11) (Miss. 2012)).

¶30.    For example, citing *custody* cases, the supreme court recognized that

> [i]n both *Pell*[7] and *J.P.M,*[8] a husband learned during the pendency of divorce proceedings that he was not the biological father of a child born of, or just prior to, the marriage. In those cases, we reasoned that the natural-parent presumption can be overcome based on several facts: (1) the husbands stood in loco parentis; (2) they had supported, cared for, and treated the child as their own; (3) they could have been required to pay child support ("[w]ith the burden should go the benefit"); and (4) the biological fathers were not really in the picture: the one in Pell had disclaimed any interest in the child and had agreed to relinquish his parental rights, while the one in J.P.M. could not even be determined conclusively.

*Id.* at 1273 (¶16) (quoting *Waites v. Ritchie* (*In re Waites*), 152 So. 3d 306, 312 (¶15) (Miss. 2014)). Specifically addressing *Waites*, the supreme court noted that there, "we found the 'unique facts' of *Pell* and *J.P.M.* were distinguishable because [in *Waites*,] the biological father pursued custody when he confirmed he was the father." *Id.* at (¶17) (citing *Waites*, 152 So. 3d at 313 (¶18)).  On these facts and in the *custody* context, the *Waites* court "reiterated that in loco parentis status will not alone rebut the natural parent presumption." *Id.*

¶31.    Concerning *visitation*, however, the supreme court in *Brownlee* ultimately recognized that a third party proving in loco parentis status may be awarded visitation "in very limited, unique situations, in which justice so requires and the child's well-being demands a relationship with a person who has stood in loco parentis in his or her life." *Id.* at 1274 (¶22)

---

[7] *Griffith v. Pell*, 881 So. 2d 184 (Miss. 2004).

[8] *J.P.M. v. T.D.M.*, 932 So. 2d 760 (Miss. 2006).

11

(citation omitted). The supreme court referenced *Davis v. Vaughn*, 126 So. 3d 37 (Miss. 2013), in this context in which the supreme court affirmed the chancery court's decision awarding visitation to the grandmother where the chancellor "recogniz[ed] the grandmother's in loco parentis status [and] . . . [found] that it would be in the best interest of the child." *Brownlee*, 368 So. 3d at 1273 (¶18); *see Davis*, 126 So. 3d at 40 (¶20).[9] The *Brownlee* court acknowledged this result in *Davis*, despite the supreme court's determination in that case that the grandmother was not entitled to *custody* rights because she did not rebut the natural parent presumption. *Brownlee*, 368 So. 3d at 1273 (¶18); *see Davis*, 126 So. 3d at 38-39 (¶15).

¶32. A similar result occurred in *Waites*, where the chancellor found that because "neither . . . [of] the child's biological parents[] was 'unfit' to raise [the child], [the mother's ex-husband], who had 'effectively act[ed] in loco parentis[,]' was entitled only to visitation rights." *Waites*, 152 So. 3d at 309 (¶9). As in *Davis*, 126 So. 3d at 38-39 (¶15), the *Waites* court affirmed the chancellor's award of in loco parentis *visitation* rights to the mother's ex-husband, *Waites*, 152 So. 3d at 314 (¶21),[10] despite recognizing that the mother's ex-

---

[9] As Presiding Justice Kitchens succinctly stated in his separate opinion, "[t]he *Davis* case demonstrates that an in loco parentis third party is not required to rebut the natural parent presumption in order to be granted visitation rights." *Brownlee*, 368 So. 3d at 1277 (¶36) (Kitchens, P.J., concurring).

[10] We recognize that there was a split in our decisions regarding visitation before the supreme court's recognition in *Brownlee* that a person having in loco parentis status to a child may be entitled to visitation "in very limited, unique situations." *Brownlee*, 368 So. 3d at 1274 (¶22). Thus, despite the results reached in *Waites* and *Davis*, this Court has found in other cases that "[j]ust as with the issue of custody, unless there is clear and convincing evidence to rebut the natural parent presumption, a stepfather 'has no right to visitation with his stepchildren under the laws of the State of Mississippi.'" *Neely v. Welch*,

husband was not entitled to *custody* rights absent a finding that the natural parents were unfit. *Id.*

¶33.    While *Brownlee* acknowledged "it is presumed that it is in the best interest of a child to remain with the natural parent as opposed to a third party," *Brownlee*, 368 So. 3d at 1274 (¶21), the supreme court did not stop its analysis there.  Continuing, the supreme court held, "But we *also* recognize that special circumstances exist, i.e., in very limited, unique situations, in which justice so requires and the child's well-being demands a relationship with a person who has stood in loco parentis in his or her life." *Id.* at (¶22) (citation and internal quotation marks omitted) (emphasis added).  As to Pam's situation in particular, the supreme court held, "The floodgates are not open for any third party visitation if the circumstances do not rise to this level, but Pam deserves an opportunity, at least, to provide proof of whether she meets this 'very limited, unique situation.'" *Id.*

¶34.    The circumstances in *Brownlee* are very similar to the circumstances before us.  That is, Pam sought in loco parentis visitation with her former partner's children without claiming the children's natural parents were unfit and, with respect to E.R.L., where both natural parents were present and had an active role in the child's life. *Id.* at 1270 (¶2). The supreme court found that Pam "deserves an opportunity" to prove whether "justice so requires and the child's well-being demands a relationship with a person who has stood in loco parentis in his

194 So. 3d 149, 160 (¶34) (Miss. Ct. App. 2015) (quoting *Pruitt v. Payne*, 14 So. 3d 806, 811 (¶11) (Miss. Ct. App. 2009)).  The dissent relies on these decisions in asserting that "[i]t is clear that the natural parent presumption applies to determinations of both custody and visitation issues." Dis. Op. at ¶74; *see also id.* at n.18.  Given the supreme court's decision in *Brownlee*, however, we do not find these decisions persuasive for the reasons addressed above.

13

or her life." *Id.* at 1274 (¶22). We find that Lisa deserves the same opportunity in this case, as we discuss below.[11]

### B. In Loco Parentis Status

¶35. "Any person who takes a child of another into his home and treats it as a member of his family, providing parental supervision, support and education, as if it were his own child, is said to stand in loco parentis." *Davis*, 126 So. 3d at 37 (¶11) (quoting *W.R. Fairchild Constr. Co. v. Owens*, 224 So. 2d 571, 575 (Miss. 1969)). This Court has also recognized that a person's intention to stay in the child's life after separation from the biological parent is also a factor to consider in determining a whether a person stands in loco parentis to the child. *Smiley v. Smiley*, 165 So. 3d 481, 488 (¶¶29-30) (Miss. Ct. App. 2015).

¶36. With these principles in mind, we examine the chancellor's final judgment. The eighteen-page judgment contains one sentence in which the chancellor ostensibly rules on the in loco parentis issue: "The Court finds and expressly DENIES a claim that Lisa stands in loco parentis to the subject minor child." Later in his opinion, the chancellor observed that "Lisa is not a grandparent of the child. Lisa is not a stepparent to the minor child. Lisa is not related by blood or marriage. Lisa and Erin did not plan this pregnancy together through [artificial insemination]"—but these observations do not address, in any way, the factors to be considered by the court in making an in loco parentis determination as set forth in *Davis*

---

[11] The dissent points out "the procedural difference between *Brownlee* and the present case," i.e., in *Brownlee*, the supreme court reversed the chancellor's Rule 12(b)(6) dismissal, while in this case the chancellor's decision was rendered after a trial on the merits. Dis. Op. at ¶71. Our decision in this case, however, is based upon the chancellor's failure to even properly address Lisa's in loco parentis status at all, as we discuss above. As such, we do not find the dissent's procedural distinction between the two cases persuasive.

14

and *Smiley* above. *See Davis*, 126 So. 3d at 37 (¶11); *Smiley*, 165 So. 3d at 88 (¶¶29-30). As such, we find that the chancellor's in loco parentis ruling is erroneous as a matter of law.

¶37.    Our role as "an appellate court is to affirm findings of fact by chancellors in domestic cases when they are 'supported by substantial evidence *unless the chancellor abused his discretion, was manifestly wrong, clearly erroneous or an erroneous legal standard was applied.*'" *Robison v. Lanford*, 822 So. 2d 1034, 1038 (¶14) (Miss. Ct. App. 2002) (emphasis added) (quoting *Holloman v. Holloman*, 691 So. 2d 897, 898 (Miss. 1996)), *aff'd*, 841 So. 2d 1119 (Miss. 2003).   Here, we find that the chancellor applied "an erroneous legal standard" by failing to address any in loco parentis factors delineated under Mississippi law. In any event, we have no way of determining whether the chancellor's ruling is supported by "substantial evidence" because the chancellor cited no evidence under the proper in loco parentis analysis in support of his bare-bones denial of Lisa's in loco parentis claim.  *Cf. Robison*, 822 So. 2d at 1038 (¶14) (recognizing in a similar context that "[t]he evidence for [the appellate court's] review must be presented to the appeals court if . . . [the court's] function is to have any meaning").

¶38.    Further, the chancellor's judgment and order denying reconsideration are also premised on the erroneous conclusion that "[t]he law requires this court to apply in loco parentis only when a parent is unfit."[12]  In particular, the chancellor concluded in his final

---

[12] In framing the issues before him, the chancellor based his decision on Lisa's failure to prove the natural parents unfit.  In the chancellor's view, the case required him to decide the following two issues:

1.    Does the law permit a third party, Lisa Edwards, to have visitation with the minor child when . . . [she] is not a grandparent and is not related

15

judgment as follows:

> As discussed herein, the parents of the minor child were not proven unfit. The law requires the [c]ourt to deny Lisa custody, visitation, or in loco parentis status. The law requires the [c]ourt to deny the application of in loco parentis to Lisa regarding L.J. Lisa does not qualify for in loco parentis status and thus is not entitled to visitation because there are two fit biological parents. The law does not allow the court to permit third-party visitation with a child when the biological parents object.

¶39. When Lisa sought reconsideration based specifically upon *Brownlee*, the chancellor similarly interpreted that case as requiring a showing of parental unfitness to establish in loco parentis status, as follows:

> [Lisa] cites the *Brownlee v. Powell* case, 368 So. 3d 1268 (Miss. 2023), for the proposition that this Court must have another hearing regarding in loco parentis. The sum total of the *Brownlee* case simply states the natural parent presumption must be overcome, *the parent must be found unfit to make a finding of in loco parentis*, and the court would have to make findings on both unfitness and overcoming the natural parent presumption to find in loco parentis before finding visitation for any third party. The facts of this case do no support overcoming the natural parent presumption or to find the parents unfit, the factors necessary for the Court to make a legal finding of in loco parentis.

(Emphasis added).

¶40. As we have addressed above, we hold that *Brownlee* does *not* stand for the proposition that "[a] parent must be found unfit to make a finding of in loco parentis," as the chancellor concluded. Rather, the supreme court held that a party *who can prove in loco parentis status*

---

> to the child by blood or marriage and the parents have not been proven unfit?

> 2. Does the law permit the court to find Lisa Edwards in loco parentis regarding [L.J.] . . . when no proof of unfitness exists for the biological parent?"

may be awarded visitation upon proving that "special circumstances exist . . . in which justice so requires and the child's well-being demands a relationship with a person who has stood in loco parentis in his or her life." *Brownlee*, 368 So. 3d at 1274 (¶22).

¶41. Like Pam in the *Brownlee* case, we find that Lisa deserves the opportunity to prove whether the special circumstances exist in her case to warrant visitation with L.J. By failing to properly assess and determine whether Lisa even stood in loco parentis to L.J., the chancellor denied Lisa this opportunity as described in *Brownlee*. Accordingly, we reverse the chancellor's judgment and remand this case with instructions that the chancery court make the requisite in loco parentis determination and conduct any further proceedings, if necessary, consistent with this opinion.

## II. *Troxel v. Granville*, 530 U.S. 57 (2000), and Proof of Parental Unfitness Prior to Seeking In Loco Parentis Visitation

¶42. Lisa asserts that the chancellor erred by "rel[ying] on *Troxel* []to support the conclusion that [she] could not seek or obtain [in loco parentis] visitation rights without first proving the legal parents unfit." We agree for the reasons addressed below.

¶43. In *Troxel*, a man and woman had two daughters out of wedlock. *Troxel*, 530 U.S. at 60. After the couple separated, the father lived with his parents and would bring the children to his parents' home for weekend visitation. *Id.* After the father died, the children's mother sought to limit the paternal grandparents' visitation, so the grandparents filed a petition requesting visitation rights pursuant to Washington's nonparental visitation statute. *Id.* at 60-61. The Washington Superior Court granted the grandparents' petition, *id.* at 61-62, but the Washington Supreme Court eventually reversed that decision on federal constitutional

17

grounds. *Id.* at 63.

¶44. On certiorari review, the United States Supreme Court affirmed the Washington Supreme Court's judgment, holding that the statute, as applied to the children's mother and her family, "unconstitutionally infringes" on the "fundamental right of parents to make decisions concerning the care, custody, and control of their children." *Id.* at 66-67. The United States Supreme Court found that the statute was "breathtakingly broad" in scope, allowing "'[a]ny person . . . [to] petition the court for visitation rights *at any time*." *Id.* at 67 (quoting Wash. Rev. Code Ann. § 26.10.160(3)). Further, the statute authorized a Washington court to decide whether "visitation may serve *the best interest of the child*," *id.*, without any "requirement that a court accord the parent's decision [regarding visitation] any presumption of validity or any weight whatsoever." *Id.* Given the Washington statute's broad parameters, the United States Supreme Court was troubled because the record showed no allegation that the mother was unfit, yet the Washington Superior Court "[i]n effect, placed on [the mother], the fit custodial parent, the burden of disproving that visitation would be in the best interest of her daughters." *Id.* at 69. Thus, "[t]he decisional framework employed by the [Washington] Superior Court directly contravened the traditional presumption that a fit parent will act in the best interest of his or her child . . . [and] failed to provide any protection for [the mother's] fundamental constitutional right to make decisions concerning the rearing of her own daughters." *Id.* at 69-70 (citation omitted).

¶45. As the dissent notes, the chancellor's opinion in the case before us "plainly state[s] that Lisa's petition for visitation 'must be denied squarely based on the U.S. Supreme Court's

18

finding in *Troxel.*'" Dis. Op. at ¶64. But in applying *Troxel*, the chancellor again insisted that because "Lisa did not prove unfitness of the natural parents James and Erin," she thus failed to "successfully rebut[]" the natural parent presumption, as follows:

> *Troxel*[, 530 U.S. at 72-73], states: The Fourteenth Amendment "Due Process Clause does not permit a State to infringe on the fundamental right of parents to make child rearing decisions simply because a state judge believes a 'better' decision could be made."
>
> The [United States] Supreme Court in *Troxel*, [530 U.S.] at 72-73, found no reason for a State to "inject itself into the private realm of the family to . . . question fit parents' ability [sic] to make the best decisions concerning the rearing of that parent's children.["]
>
> *As discussed herein, the parents of the minor child were not proven unfit. The law requires the Court to deny Lisa custody, visitation, or in loco parentis status*.
>
> The law requires the Court to deny the application of in loco parentis to Lisa regarding L.J. *Lisa does not qualify for in loco parentis status and thus is not entitled to visitation because there are two fit biological parents. The law does not allow the Court to permit third-party visitation with a child when the biological parents object*. (*Troxel*).

(Emphasis added).

¶46. Upon review of the final judgment and the applicable law, we find that the chancellor erred in applying *Troxel* to the distinguishable facts in this case and in light of the critical distinctions between the "breathtakingly broad" statute at issue in *Troxel* and the application of Mississippi's in loco parentis visitation here. The United States Supreme Court's concerns in *Troxel* centered on the Washington Superior Court's failure "to accord the determination of [the mother], a fit custodial parent, any material weight," *Troxel*, 530 U.S. at 72, or base its "order . . . on any special factors[—such as parental unfitness—]that might justify the

19

State's interference with [the mother's] fundamental right to make decisions concerning the rearing of her two daughters." *Id.* at 68.

¶47. The United States Supreme Court's concerns in *Troxel* do not arise here. In contrast to the statute in *Troxel*, Mississippi's in loco parentis doctrine does not apply to just "any person" seeking visitation "at any time" but, rather, applies only when a person can show she has "provid[ed] parental supervision, support and education" for the child and treated the child "as if [he] were [her] own child." *Davis*, 126 So. 3d at 37 (¶11).

¶48. Additionally, as the supreme court explained in *Brownlee*, the in loco parentis doctrine is to be *narrowly applied* in the visitation context—namely, only "in [those] very limited, unique situations, in which justice so requires and the child's well-being demands a relationship with a person who has stood in loco parentis in his or her life." *Brownlee*, 368 So. 3d at 1274 (¶22) (citation omitted). These requirements ensure that "[t]he floodgates are not open for *any* third party visitation if the circumstances do not rise to this level." *Id.* (emphasis added). Finally, we find nothing in *Troxel* that would require a court to make a preliminary finding of parental unfitness before even determining whether a party seeking visitation stands in loco parentis to the child in the first instance.

¶49. For these reasons, in addition to those delineated in the previous section, we reverse the chancellor's final judgment and remand this case with instructions that the chancery court determine Lisa's in loco parentis status to L.J. and conduct further proceedings, if necessary, consistent with this opinion.

### III. Unclean Hands

20

¶50. Lisa asserts that "[t]he chancellor improperly relied on the doctrine of unclean hands to bar [her] claims, finding that she participated in concealing L.J.'s existence from his potential biological father." We agree, as discussed below.

¶51. As this Court has recognized, "[t]he doctrine of unclean hands provides that 'he who comes into equity must come with clean hands.'" *Vincent v. Rickman*, 167 So. 3d 245, 249 (¶11) (Miss. Ct. App. 2015) (quoting *Thigpen v. Kennedy*, 238 So. 2d 744, 746 (Miss.1970)); *accord Stewart v. Stewart*, 309 So. 3d 44, 71 (¶75) (Miss. Ct. App. 2020). The dissent relies on this general maxim in asserting that "based upon her unclean hands alone, the chancellor could have denied Lisa the relief she sought." Dis. Op. at ¶73. But we find that a related principle is relevant here, namely, "the principle that '[t]he doctrine of unclean hands cannot override the chancellor's duty to award custody in the best interests of the child.'" *Stewart*, 309 So. 3d at 71 (¶75) (quoting *Shelton v. Shelton*, 653 So. 2d 283, 287 (Miss. 1995)). In *Brownlee*, the supreme court similarly recognized that where "special circumstances exist," the overriding best interests of the child must likewise be served in the context of in loco parentis visitation. *Brownlee*, 368 So. 3d at 1274 (¶22).

¶52. In this case, the chancellor never properly reached the issue of whether in loco parentis visitation with Lisa would be in L.J.'s best interest because "Lisa did not prove unfitness of the natural parents James and Erin" and, thus, failed to "successfully rebut[]" the natural parent presumption.[13] Under these circumstances, we find as a matter of law that the

---

[13] As noted above, the chancellor recognized that "if the natural[]parent presumption is successfully rebutted," the court may then "determine[] whether an award of custody to the challenging party will serve in the child's best interest," but the chancellor did not undergo this determination in this case because "Lisa did not prove unfitness of the natural

21

chancellor erred in applying the unclean hands doctrine before ever determining Lisa's in loco parentis status to L.J. and, if necessary, reaching the issue of whether visitation with Lisa was in L.J. best interest.

## CONCLUSION

¶53.   For the reasons addressed above, we reverse the chancery court's final judgment and remand the case with instructions to the chancery court to determine Lisa's in loco parentis status to L.J. and conduct further proceedings, if necessary, consistent with this opinion.

¶54.   **REVERSED AND REMANDED.**

**BARNES, C.J., WESTBROOKS, McDONALD, McCARTY AND LASSITTER ST. PÉ, JJ., CONCUR.  WEDDLE, J., CONCURS IN PART AND DISSENTS IN PART WITHOUT SEPARATE WRITTEN OPINION.  WILSON, P.J., DISSENTS WITHOUT SEPARATE WRITTEN OPINION.  EMFINGER, J., DISSENTS WITH SEPARATE WRITTEN OPINION, JOINED IN PART BY WILSON, P.J., AND WEDDLE, J.  LAWRENCE, J., NOT PARTICIPATING.**

**EMFINGER, J., DISSENTING:**

¶55.   The majority concludes the chancellor erred by finding that Lisa did not stand *in loco parentis* to L.J. because he did not show that he had considered the appropriate factors and did not cite any facts to support his decision. The majority also concludes the chancellor erred by finding that *in loco parentis* status only applies where one or both natural parents are unfit. In reversing and remanding the case to the chancery court, the majority concludes that Lisa deserves the opportunity to prove whether special circumstances exist to warrant her having visitation rights with L.J.

¶56.   I would find that Lisa had the opportunity to put on her proof during a multiple-day

_____

parents James and Erin."

22

trial that extended over several months. Accordingly, she either put on proof to support her claims, or she did not. As will be discussed below, the chancellor found that she did not meet the burden of proof required to support her claim for visitation. Lisa had to produce clear and convincing evidence to overcome the natural parent presumption, or she had to show that she met the "very limited, unique situations" as set forth in *Brownlee*. Based upon *Troxel* and other cases, one of those findings is necessary before the chancellor may override both natural parents' testimony that it is not in their child's best interest for Lisa to have court-ordered visitation.

¶57.    Because I believe the chancellor properly denied Lisa's petition for visitation based upon the natural parents' fundamental constitutional right to make decisions in the best interest of their child as expressed in *Troxel v. Granville*, 530 U.S. 57 (2000), and Mississippi cases concerning what must be proved to overcome that presumption favoring natural parents, I respectfully dissent. I would also find that the chancellor's decision can be affirmed based upon Lisa's "unclean hands."

###    I.    *In Loco Parentis* Status

¶58.    The majority first concludes the chancellor erred by finding that Lisa did not stand *in loco parentis* with the child.[14] In *Miller v. Smith*, 229 So. 3d 100, 104 (¶15) (Miss. 2017),

---

[14] The majority takes issue with this statement and contends that I fail to appreciate the nuance in the majority's reasoning concerning *in loco parentis*. The majority writes that the chancellor failed to "properly" address this issue. However, the majority cites the chancellor's order where he "expressly denies a claim that Lisa stands in loco parentis" and another instance where he denied "the application of in loco parentis to Lisa . . . [, stating] Lisa does not qualify for in loco parentis . . . ." I would find that the distinction between *did not properly address* and *erred by denying in loco parentis status* is a distinction without a difference in this case. My point is that under the facts of this case, as will be discussed

the supreme court discussed what proof is needed in order to establish *in loco parentis* status:

> *In loco parentis* means "in the place of a parent." *Farve v. Medders*, 241 Miss. 75, 81, 128 So. 2d 877, 879 (1961). It is defined as "one who has assumed the status and obligations of a parent without a formal adoption." *Id*. More specifically, "[a]ny person who takes a child of another into his home and treats it as a member of his family, providing parental supervision, support and education, as if it were his own child is said to stand [*in loco parentis*]." *Logan v. Logan*, 730 So. 2d 1124, 1126 (¶8) (Miss. 1998) (citation omitted). Whether *in loco parentis* status exists is "a matter of intention and of fact to be deduced from the circumstances of the particular case." *Farve*, 128 So. 2d at 879 (citation omitted).

While I may agree that the chancellor erred in finding that Lisa did not meet the requirements, it was a factual decision, made by the chancellor, based upon the facts of this particular case. In any event, I would find that any error in that finding was harmless error at most.[15] We have many cases that find that *in loco parentis* status alone cannot rebut the natural parent presumption. *Miller*, 229 So. 3d at 104-05 (¶18); *Waites v. Ritchie (In re Waites)*, 152 So. 3d 306, 311-12 (¶15) (Miss. 2014); *Davis v. Vaughn*, 126 So. 3d 33, 34-35 (¶1) (Miss. 2013); *Smith v. Smith*, 97 So. 3d 43, 47 (¶11) (Miss. 2012). As discussed below, because Lisa did not put on clear and convincing evidence as to the other elements necessary to rebut the presumption, I would affirm the chancellor's denial of Lisa's petition for visitation.

---

below, it does not matter whether Lisa stood *in loco parentis* with the child.

[15] In *Hays v. LaForge*, 333 So. 3d 595, 602 (¶15) (Miss. Ct. App. 2022), this Court stated:

> "[A]n appellate court may affirm a trial court if the correct result is reached, even if the trial court reached the result for a different reason." *Davis v. City of Jackson*, 240 So. 3d 381, 384 (¶13) (Miss. 2018).

24

## II. Parents' Fundamental Constitutional Right to Make Decisions in the Best Interest of Their Children

¶59. In *Troxel*, the paternal grandparents petitioned to have the right to visit their deceased son's daughters.[16] *Troxel*, 530 U.S. at 61. The State of Washington had enacted a statute that provided at the time, in part:

> Any person may petition the court for visitation rights at any time including, but not limited to, custody proceedings. The court may order visitation rights for any person when visitation may serve the best interest of the child whether or not there has been any change of circumstances.[17]

*Id*. at 61. The girls' mother, Granville, did not oppose all visitation with the Troxels, but objected to the amount of visitation sought by their petition. *Id*. In 1995, when the trial court in an oral ruling awarded the Troxels more visitation than Granville desired, she appealed. *Id*.

¶60. While the case was on appeal, Granville married Kelly Wynn. *Id*. Without addressing the merits of the case, the Washington Court of Appeals reversed and remanded the matter to the trial court with instructions to enter written findings of fact and conclusions of law. *Id*. The trial court, on remand, found that visitation with the Troxels was in the girls' best interest. *Id*. About nine months after the trial court entered its order on remand, Wynn formally adopted Granville's daughters. *Id* at 62.

---

[16] While the Troxels' son and Granville were in a relationship and had two daughters together, they never married. *Id*. at 60. Their relationship ended in 1991. *Id*. The Troxels' son committed suicide in May 1993, and the Troxels filed their petition in December 1993 after Granville had begun to limit their visitation with her daughters to one visit per month. *Id*. at 60-61.

[17] This statutory provision has since been repealed.

25

¶61.     Granville appealed the trial court's written order. *Id*. The Washington Court of Appeals reversed the trial court's decision based upon the Troxels' lack of standing. *Id*. The court ruled that "limitation on nonparental visitation actions was 'consistent with the constitutional restrictions on state interference with parents' fundamental liberty interest in the care, custody, and management of their children." *Id*. (internal quotation marks omitted). The court of appeals did not address Granville's constitutional challenge to the visitation statute. *Id*. The Troxels petitioned the Washington Supreme Court for review. While the supreme court disagreed with the court of appeals' standing decision as a basis for reversal, the supreme court agreed with the ultimate conclusion of the court of appeals. *Id*. at 62-63. The Washington Supreme Court based its decision on the federal Constitution. *Id*. at 63. The supreme court found that the visitation statute cited above "unconstitutionally infringes on the fundamental right of parents to rear their children." *Id*. The Washington Supreme Court noted two problems with the statute. *Id*. First, the Constitution permits a state to interfere with parents' rights to rear their children *only to prevent harm or potential harm to the children*. *Id*. (emphasis added). The court noted that the statute requires no threshold showing of harm and therefore violates the constitutional standard. *Id*. Second, the supreme court found the statute to be overly broad by allowing "'any person' to petition for forced visitation of a child at 'any time' with the only requirement being that the visitation serve the best interest of the child." *Id*. The Washington Supreme Court further held that "[p]arents have a right to limit visitation of their children with third persons" and that between parents and judges, "the parents should be the ones to choose whether to expose their children to certain

26

people or ideas." *Id*.

¶62.    The Troxels sought review by the United States Supreme Court. In affirming the decision of the Washington Supreme Court, the United States Supreme Court first discussed parents' right to make decisions they feel are in their child's best interest:

> The Fourteenth Amendment provides that no State shall "deprive any person of life, liberty, or property, without due process of law." We have long recognized that the Amendment's Due Process Clause, like its Fifth Amendment counterpart, "guarantees more than fair process." *Washington v. Glucksberg*, 521 U.S. 702, 719, 117 S. Ct. 2258 (1997). The Clause also includes a substantive component that "provides heightened protection against government interference with certain fundamental rights and liberty interests." *Id*., at 720, 117 S. Ct. 2258; *see also Reno v. Flores*, 507 U.S. 292, 301-302, 113 S. Ct. 1439, 123 L. Ed. 2d 1 (1993).
>
> **The liberty interest at issue in this case—the interest of parents in the care, custody, and control of their children—is perhaps the oldest of the fundamental liberty interests recognized by this Court**. More than 75 years ago, in *Meyer v. Nebraska*, 262 U.S. 390, 399, 401, 43 S. Ct. 625, 67 L. Ed. 1042 (1923), we held that the "liberty" protected by the Due Process Clause includes the right of parents to "establish a home and bring up children" and "to control the education of their own." Two years later, in *Pierce v. Society of Sisters*, 268 U.S. 510, 534-535, 45 S. Ct. 571, 69 L. Ed. 1070 (1925), we again held that the "liberty of parents and guardians" includes the right "to direct the upbringing and education of children under their control." We explained in *Pierce* that "[t]he child is not the mere creature of the State; those who nurture him and direct his destiny have the right, coupled with the high duty, to recognize and prepare him for additional obligations." *Id*., at 535, 45 S. Ct. 571. We returned to the subject in *Prince v. Massachusetts*, 321 U.S. 158, 64 S. Ct. 438, 88 L. Ed. 645 (1944), and again confirmed that there is a constitutional dimension to the right of parents to direct the upbringing of their children. **"It is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder**." *Id*., at 166, 64 S. Ct. 438.

*Id*. at 65-66 (emphasis added).

¶63.    Then, as it relates to the Washington statute and the Troxels' petition, the United

27

States Supreme Court stated:

**First, the Troxels did not allege, and no court has found, that Granville was an unfit parent. That aspect of the case is important, for there is a presumption that fit parents act in the best interests of their children**. As this Court explained in *Parham* [*v. J. R.*, 442 U.S. 584 (1979)]:

> "[O]ur constitutional system long ago rejected any notion that a child is the mere creature of the State and, on the contrary, asserted that parents generally have the right, coupled with the high duty, to recognize and prepare [their children] for additional obligations. . . . The law's concept of the family rests on a presumption that parents possess what a child lacks in maturity, experience, and capacity for judgment required for making life's difficult decisions. More important, historically it has recognized that natural bonds of affection lead parents to act in the best interests of their children." 442 U.S., at 602, 99 S. Ct. 2493 (alteration in original) (internal quotation marks and citations omitted).

**Accordingly, so long as a parent adequately cares for his or her children (i.e., is fit), there will normally be no reason for the State to inject itself into the private realm of the family to further question the ability of that parent to make the best decisions concerning the rearing of that parent's children**. *See, e.g.*, *Flores*, 507 U.S., at 304, 113 S. Ct. 1439.

The problem here is not that the Washington Superior Court intervened, but that when it did so, **it gave no special weight at all to Granville's determination of her daughters' best interests**. **More importantly, it appears that the Superior Court applied exactly the opposite presumption** . . . . The judge's comments suggest that he presumed the grandparents' request should be granted unless the children would be "impact[ed] adversely." In effect, the judge placed on Granville, the fit custodial parent, the burden of disproving that visitation would be in the best interest of her daughters. The judge reiterated moments later: "I think [visitation with the Troxels] would be in the best interest of the children and I haven't been shown it is not in [the] best interest of the children." *Id.*, at 214, 113 S. Ct. 1439.

**The decisional framework employed by the Superior Court directly contravened the traditional presumption that a fit parent will act in the best interest of his or her child**. *See Parham*, *supra*, at 602, 99 S. Ct. 2493. **In that respect, the court's presumption failed to provide any protection**

**for Granville's fundamental constitutional right to make decisions concerning the rearing of her own daughters**. . . . . In an ideal world, parents might always seek to cultivate the bonds between grandparents and their grandchildren. Needless to say, however, our world is far from perfect, and in it the decision whether such an intergenerational relationship would be beneficial in any specific case is for the parent to make in the first instance. **And, if a fit parent's decision of the kind at issue here becomes subject to judicial review, the court must accord at least some special weight to the parent's own determination.**

*Id.* at 68-70 (emphasis added).

¶64. In the case at bar, the chancellor plainly stated that Lisa's petition for visitation "must be denied squarely based on the U.S. Supreme Court's finding in *Troxel.*" The chancellor also referenced Mississippi cases citing *Troxel*, including *Pruitt v. Payne*, 14 So. 3d 806, 810 (¶¶8-9) (Miss. Ct. App. 2009), where this Court stated:

The United States Supreme Court has acknowledged that "the Due Process Clause of the Fourteenth Amendment protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children." *Troxel v. Granville*, 530 U.S. 57, 66, 120 S. Ct. 2054, 147 L. Ed. 2d 49 (2000). There is a general presumption that a parent who is fit will act in the best interest of his or her child. *Id.* at 68, 120 S. Ct. 2054. A court must accord some special weight to a fit parent's determination of a child's best interests. *Id.* at 69, 120 S. Ct. 2054. "Parents with custody have a paramount right to control the environment, physical, social, and emotional [situations], to which their children are exposed." *Stacy v. Ross*, 798 So. 2d 1275, 1280 (¶23) (Miss. 2001).

**Generally, a court will not grant visitation rights to grandparents or third parties over the objection of a fit custodial parent**. *Naveda v. Ahumada*, 381 So. 2d 147, 149-50 (Miss.1980) (quoting 59 Am. Jur. 2d *Parent and Child* § 45 (1971)).

(Emphasis added). *Pruitt* has since been cited with approval in *Neely v. Welch*, 194 So. 3d

29

149, 160 (¶34) (Miss. Ct. App. 2015):[18]

> **Just as with the issue of custody, unless there is clear and convincing evidence to rebut the natural parent presumption, a stepfather "has no right to visitation with his stepchildren under the laws of the State of Mississippi**." *Pruitt v. Payne*, 14 So. 3d 806, 811 (¶ 11) (Miss. Ct. App. 2009); *see also Scruggs v. Saterfiel*, 693 So. 2d 924, 926 (Miss. 1997) (concluding that it is up to the Legislature "to expand [visitation] rights . . . to siblings or other third parties as it sees fit"). As discussed above, Roger did not overcome the natural parent presumption by clear and convincing evidence. Therefore, the chancellor did not err by not granting him visitation.

(Emphasis added).

¶65.    The record shows that Erin began a romantic relationship with James Dwyer in April 2015, while both were residents of Florida. Erin testified that by the time she realized she was pregnant with James's child in September 2015, she had lost contact with James. Erin testified that she did not advise James of her pregnancy. Before L.J. was born, Erin began a romantic relationship with Lisa in December 2015. Lisa testified that she knew James was the baby's father before she began her relationship with Erin. Lisa admitted that she agreed with Erin to tell friends and family that L.J. had been born as a result of artificial insemination. Erin gave birth to L.J. in February 2016, and Lisa was present to "cut the cord."[19] Erin and L.J. moved back to Mississippi for the months of March through May 2016, while Lisa was still in Maryland. In May 2016, all three moved back to Florida. In the spring

---

[18] Both *Pruitt* and *Neely* clearly show that the "natural parent presumption" applies to both custody and visitation claims made by third parties.

[19] Lisa was living in Rockville, Maryland, at the time of the child's birth. She testified that she was in town for two days before the birth of the child and stayed for two weeks after his birth. She continued to live in Maryland until May 2016, at which time she moved to Florida.

30

of 2017, Lisa, Erin and L.J. moved to Ohio and lived with Lisa's mother until they later bought a house together. Erin and Lisa continued to keep the identity of L.J.'s natural father secret until their relationship ended badly in April 2018.[20] Shortly after, both Erin and Lisa separately contacted James and told him about his son. The chancellor found, however, that the purpose of Lisa's contact was an attempt to encourage James to "'go get his baby' and obtain custody because, in [Lisa's] opinion, [Erin] was an 'unfit mother.'" Lisa admitted at trial that she told James about L.J. because she was "upset" with Erin and wanted James to get custody so she could have visitation with the child.

¶66. The chancellor found, based upon the evidence, that Erin and James are L.J.'s natural parents. The court also ruled that once James became aware of his son, he "acted affirmatively to establish paternity and sought visitation with the child. He was not an absent father once he was made aware of the existence of his child." The chancellor further found that Erin and James "are fit parents and are entitled to object to [Lisa's] desire for visitation." Both Erin and James testified that visitation with Lisa was not in their child's best interest. The chancellor concluded that Lisa had not overcome the natural parent presumption by clear and convincing evidence.

¶67. In *T.D. ex rel. D'Anjou v. Austin*, 324 So. 3d 1187 (Miss. Ct. App. 2021), this Court

---

[20] Erin described her relationship with Lisa as "tumultuous." She told the chancellor in June 2017, when Lisa was driving Erin and L.J. to the airport for a visit to Mississippi, Erin said something about the child not being Lisa's "blood." Lisa became erratic and almost swerved off the road. In November 2017, Erin told Lisa she did not want to be with her anymore and wanted to move back to Mississippi. She testified that she felt trapped. When she told Lisa she wanted to leave, Lisa threatened to kill herself. At that point, Erin testified that she agreed to go to therapy with Lisa because she wanted to help Lisa come to terms with the fact that she and L.J. were leaving.

31

identified what proof must be produced to rebut the natural parent presumption:

> The natural-parent presumption can be rebutted by a clear showing that (1) the parent has abandoned the child; (2) the parent has deserted the child; (3) the parent's conduct is so immoral as to be detrimental to the child; or (4) the parent is unfit, mentally or otherwise, to have custody.[21]

*Id*. at 1193 (¶19) (quoting *Smith*, 97 So. 3d at 46 (¶8)). Any of these factors would tend to indicate that a parent is "unfit." The chancellor found that Erin and James are the natural parents of L.J. and that both are fit parents. He further found that both "fit" natural parents objected to Lisa having court-ordered visitation with their child. Finding that Lisa had not rebutted the presumption, the chancellor ruled that Lisa's claim for relief must be denied pursuant to *Troxel* in order to protect the parents' constitutional right to make such decisions on behalf of their child.

¶68. Concerning our standard of review of a chancellor's findings of fact and application of the law, this Court stated in *Begnaud v. Begnaud*, 409 So. 3d 604, 610 (¶19) (Miss. Ct. App. 2025):

> "Chancellors are afforded wide latitude in fashioning equitable remedies in domestic relations matters, and their decisions will not be reversed if the findings of fact are supported by substantial credible evidence in the record." *Rhodes v. Rhodes*, 52 So. 3d 430, 435 (¶15) (Miss. Ct. App. 2011) (citations and internal quotation marks omitted). This Court "will not disturb a chancellor's factual findings unless the chancellor's decision was manifestly wrong or clearly erroneous, or the chancellor applied an improper legal standard." *Id*. Even if we disagree with the findings of fact and would arrive at a different outcome, "[w]e do not substitute our judgment for that of the chancellor." *Id*. When reviewing a chancellor's interpretation and application of the law, our standard of review is de novo. *Id*.

I would conclude that the chancellor's findings as noted above were supported by substantial

---

[21] I will discuss the *Brownlee* standard to rebut the presumption later.

32

evidence and were not manifestly wrong or clearly erroneous, and the chancellor applied the proper legal standards in reaching his decision.

### III. *Brownlee*

¶69. The majority opinion relies heavily upon the decision in *Brownlee v. Powell*, 368 So. 3d 1268 (Miss. 2023). I take the view that the chancellor's decision in the present case actually finds support in the *Brownlee* decision. In *Brownlee*, our supreme court recited facts similar to the facts in the case at bar:

> In 2007, Jessica Powell's son, A.M.P., was born. While A.M.P.'s natural father is unknown, A.M.P.'s legal father is Thomas Wayne Powell by marriage. Thomas maintains no relationship with A.M.P. In 2014, Jessica's daughter, E.R.L., was born. E.R.L.'s natural and legal father is Ryan Lowery, who has been an active parent in her life and assumed all responsibilities of parenthood.
>
> [Brownlee] and Jessica began their romantic relationship in early 2014, just before E.R.L.'s birth, and the couple lived together throughout their relationship until their breakup in 2019. Even though [Brownlee] and Jessica cohabited from 2014 to 2019, they did not marry. On December 19, 2019, approximately two months after the couple's breakup in October 2019, [Brownlee] filed her Petition to Establish Custody and Visitation, in which [Brownlee] initially sought custody of E.R.L. and visitation with A.M.P.
>
> At the initial hearing on October 6, 2020, [Brownlee] withdrew her request for custody of E.R.L. [*Brownlee*] *revised her position, seeking only visitation with Jessica's children under the doctrine of in loco parentis*. Although the chancellor did not find any legal basis for [Brownlee's] request, given *her status as an unmarried nonparent and former live-in partner to the children's natural mother*, the chancellor allowed [Brownlee] to brief her position and granted Jessica the opportunity to file a rebuttal.

*Id*. at 1270-71 (¶¶2-4) (emphasis added) (footnotes omitted).

¶70. The court then addressed the burden that must be carried by a person who claims rights as one standing *in loco parentis* in order to overcome the natural parent presumption:

33

> This Court has recognized third party visitation for those standing *in loco parentis* "**in very limited, unique situations**[.]" *Wells v. Smith (In re Smith)*, 97 So. 3d 43, 47 (Miss. 2012). While typically, the natural parent presumption must be overcome, certain circumstances have required a different outcome in light of justice and for the child's well-being. *See Griffith v. Pell*, 881 So. 2d 184 (Miss. 2004); *J.P.M. v. T.D.M.*, 932 So. 2d 760 (Miss. 2006). As such, ***in loco parentis* status can sometimes be used to *help* rebut the natural parent presumption in these "limited, unique situations**[.]" *In re Smith*, 97 So. 3d at 47.

*Id*. at 1272 (¶9) (emphasis added).

¶71. Brownlee's claim had been dismissed pursuant to a motion under Mississippi Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which can be granted. In reversing the dismissal and sending the matter back to chancery court for an evidentiary hearing, the court in *Brownlee* stated:

> **On remand, if [Brownlee] can prove that she falls within this Court's carved out exception of the "very limited, unique situations" below, her claim succeeds**.
>
> In both *Pell* and *J.P.M*, a husband learned during the pendency of divorce proceedings that he was not the biological father of a child born of, or just prior to, the marriage. In those cases, we reasoned that the natural-parent presumption had been overcome based on several facts: (1) the husbands stood in loco parentis; (2) they had supported, cared for, and treated the child as their own; (3) they could have been required to pay child support ("[w]ith the burden should go the benefit"); *and* (4) **the biological fathers were not really in the picture**: the one in *Pell* had disclaimed any interest in the child and had agreed to relinquish his parental rights, while the one in *J.P.M.* could not even be determined conclusively.

*Id*. at 1272-73 (¶16) (emphasis added) (quoting *Waites*, 152 So. 3d at 312 (¶15) (quoting *In re Smith*, 97 So. 3d at 46 (¶11))). First, I must note the procedural difference between *Brownlee* and the present case. *Brownlee* was decided on an appeal of the chancellor's ruling on a pretrial motion, and Brownlee had no opportunity to put on proof. The case at bar was

decided after a full trial on the merits where Lisa, Erin, James, and the GAL, Matthew Pavlov, all testified. Lisa also called Geraldine Edwards, her mother, Beth Gillian, and Kerry Kaser to testify in support of her claim. As noted above, Lisa had her opportunity to put on proof to rebut the presumption favoring the natural parents; therefore, there is no reason to remand the case to give Lisa another opportunity to put on proof. Second, the supreme court in *Brownlee* made it clear that all four factors must exist in order for the status of *in loco parentis* to overcome the natural parent presumption. The fourth factor is that the biological father not be in the child's life. The court stated:

> [W]e found the "unique facts" of *Pell* and *J.P.M.* were distinguishable because the biological father pursued custody when he confirmed he was the father. *Id.* at 313 (internal quotation marks omitted). The presumed father knew for two years prior to his and his wife's divorce proceedings that he was not the father when they actively purported his paternity to the court. *Id.* **We reiterated that in loco parentis status will not alone rebut the natural parent presumption.** *See Smith*, 97 So. 3d at 47.

*Id.* at (¶17) (emphasis added). Clearly, if the natural father is in the child's life, *in loco parentis* alone cannot overcome the presumption. In the present case, James began a relationship with L.J. once he became aware that he was his father, and he sought custody and visitation with his child.

¶72.    Concerning the rights of the natural parents compared to one standing *in loco parentis*, the supreme court stated in *Brownlee*:

> "Giving preference to natural parents, even against those who have stood in their place, honors and protects the fundamental right of natural parents to rear their children." *Id.* (citing *Vance v. Lincoln Cnty. Dep't of Pub. Welfare*, 582 So. 2d 414, 417 (Miss. 1991)). This concept is hardly new:
>
> > Nature gives to parents that right to the custody of their children

35

which the law merely recognizes and enforces. It is scarcely less sacred than the right to life and liberty, **and can never be denied save by showing the bad character of the parent, or some exceptional circumstances** which render its enforcement inimical to the best interests of the child.

*Id*. at 37-38 (Miss. 2013) (quoting *Moore v. Christian*, 56 Miss. 408 (1879)).

*Id*. at 1273-74 (¶19) (emphasis added). I would find that whether we consider the elements required to rebut the natural parent presumption as set forth in *T.D. ex rel. D'Anjou* or the special circumstances listed in *Brownlee*, the chancellor did not err by finding that Lisa did not put on sufficient proof to rebut the natural parent presumption.

## IV. Unclean Hands

¶73. The court also found, as noted above, that Lisa came into court with "unclean hands" and, therefore, was not entitled to the relief she sought. In *Chapman v. Ward*, 3 So. 3d 790, 799 (¶29) (Miss. Ct. App. 2008), we stated:

This Court has explained the doctrine of unclean hands as follows:

The principle of "unclean hands" dictates that he who comes into equity must come with clean hands. . . . [T]he meaning of this maxim is to declare that no person as a complaining party can have the aid of a court of equity **when his conduct with respect to the transaction in question has been characterized by wilful inequity**. . . . The court may apply this doctrine sua sponte where it is shown applicable.

*Lane* [*v. Lane*], 850 So. 2d [122,]126 (¶11) [(Miss. Ct. App. 2002)] (internal citations and quotations omitted).

(Emphasis added). Further, in *Lahmann v. Hallmon*, 722 So. 2d 614, 621 (¶23) (Miss. 1998), the supreme court explained:

In addressing this doctrine, the supreme court has stated:

36

> Courts apply the maxim requiring "clean hands" only where some unconscionable act of one coming for relief has immediate and necessary relation to the equity that he seeks in respect of the matter in litigation. They do not close their doors because of plaintiff's misconduct, whatever its character, that has no relation to anything involved in the suit, but only for such violations of conscience as in some measure affect the equitable relations between the parties in respect of something brought before the court for adjudication.

*Pierce v. Heritage Props. Inc.*, 688 So. 2d 1385, 1391 (Miss. 1997) (quoting *Keystone Driller Co. v. General Excavator Co.*, 290 U.S. 240, 245, 54 S. Ct. 146, 78 L. Ed. 293 (1933)).

Again, in the present case, Lisa knowingly kept L.J.'s parentage secret from James and others by advancing the fiction that L.J. was conceived by artificial insemination. This facade, jointly created by Erin and Lisa, kept James from his son for a little more than the first two years of his life. Factually, it was this two-year period that allowed Lisa to form her relationship with L.J. at the expense of James's relationship with his son. Since this misconduct is directly related to her claim of *in loco parentis*, it was proper for the chancellor to deny Lisa relief. Thus, based upon her unclean hands alone, the chancellor could have denied Lisa the relief she sought.

## V.    Conclusion

¶74.    It is clear that the natural parent presumption applies to determinations of both custody and visitation issues. I can find no Mississippi case where a chancellor has awarded visitation to a third party where both natural parents are a part of the child's life, both parents have been determined to be fit parents, and both fit, natural parents testified that it was not in their child's best interest to have court-ordered visitation with the third party. Based upon the

application of the constitutional rights of L.J.'s natural parents under *Troxel*, Lisa's failure to produce sufficient proof to rebut the natural parent presumption, and Lisa's unclean hands, I would affirm the chancellor's denial of Lisa's petition.

**WILSON, P.J., AND WEDDLE, J., JOIN THIS OPINION IN PART.**